UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| DAVID A. FLEENER, | Case No. 12-CV-3085 (PJS/LIB) |
| Plaintiff, | |
| v. | ORDER |
| WRIGLEY SALES COMPANY, LLC, d/b/a Wm. Wrigley Jr. Company, | |
| Defendant. | |

Ian S. Laurie and Gerald T. Laurie, LAURIE & LAURIE, P.A., for plaintiff.

Thomas R. Davies, Laura Bailey Gallagher, and Harry R. Harmon, HARMON & DAVIES, P.C.; Douglas P. Seaton and Martin D. Kappenman, SEATON, PETERS & REVNEW, P.A., for defendant.

Plaintiff David Fleener brings this action under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 et seq., against his former employer, defendant Wrigley Sales Company, LLC ("Wrigley"). Fleener also brings a claim of retaliation under Minn. Stat. § 181.964, which prohibits an employer from retaliating against an employee for requesting a copy of his or her personnel file. This matter is before the Court on Wrigley's motion for summary judgment. For the reasons stated below, Wrigley's motion is granted.

I. BACKGROUND

Fleener first began working for Wrigley in 1990 as a territory sales manager. Fleener Dep. 11. He worked his way up through the ranks until he was promoted to regional market manager in March 2012. Fleener Dep. 13. As a regional market manager, Fleener was in charge of two broker-supervisors and their teams of territory sales managers. Fleener Dep. 13. Fleener

worked mostly in the field; his territory consisted of North Dakota, Minnesota, and Wisconsin, and parts of South Dakota, Iowa, and Illinois. Fleener Dep. 15. Fleener was a valuable employee; he received various performance awards over the years and had no record of disciplinary problems or negative performance reviews. Fleener Aff. ¶¶ 1-5; Hand Dep. 10-11.

When Fleener was promoted to regional market manager, Joseph Schalberg became his supervisor. Fleener Dep. 13. Fleener and Schalberg spoke over the phone once or twice per week. Fleener Dep. 126. Each time they spoke on the phone, Schalberg would begin the conversation by making crude or vulgar remarks.[1] Fleener Dep. 126. For example, after Fleener hired three women as territory sales managers, Schalberg told Fleener that hiring three women at the same time would create "problems" and, in conversations with Fleener, Schalberg referred to the women as the "three bitches club." Fleener Dep. 18-19. Schalberg would also comment on female employees' appearance and breast size and expressed his desire to have sex with them. Fleener Dep. 21-26, 29-31. On one occasion, after Fleener copied upper management on an email to Schalberg, Schalberg lectured Fleener about keeping his "dick in [his] pants." Fleener Dep. 26-27. On another occasion, when Fleener circulated a photo of the three new female employees, Schalberg replied with an image of a logo for the television show "Charlie's Angels" with an arrow indicating that "Charlie's" should be changed to "Davie's." Fleener Dep. Ex. 32.

With the exception of the "Davie's Angels" email, Fleener does not claim that Schalberg ever made any of these inappropriate remarks directly to any female employee (or to anyone else, for that matter). Instead, Fleener claims only that Schalberg made the remarks during

---

[1] Schalberg denies Fleener's claims, but the Court must treat them as true for purposes of ruling on Wrigley's summary-judgment motion.

private phone calls with Fleener. Fleener Dep. 125-26. Fleener says that he nearly always objected to these comments, telling Schalberg that they were unwanted and inappropriate and made Fleener uncomfortable. Fleener Dep. 132-33. Fleener did not mention his concerns about Schalberg to anyone but Schalberg. Fleener Dep. 32, 57, 131.

In early September 2012, Fleener sent a message to his subordinates stating that anyone who failed to make certain performance goals by October 31 would be placed on a performance improvement plan ("PIP"). Laurie Aff. Ex. 7. Schalberg was unhappy with this threat, telling Fleener that it was "totally off base" and that mentioning PIPs in a mass email "has the possibility of destroying morale . . . ." Dutton Aff. Ex. 6 at DEF000575.[2] Fleener sent an apology to his subordinates. Dutton Aff. Ex. 6 at DEF000601.

A few days later, Fleener sent an email to his subordinates regarding an upcoming national sales meeting in Tucson. Laurie Aff. Ex. 5. Among other things, Fleener told his subordinates that "[a]ll eyes and ears are watching and listening at all times (even listening in restrooms during breaks), [so] be careful what you say and do." *Id.* Fleener also stated that "[m]anagement watches closely and notes who is late" and that attendees' attitudes are "being observed by management." *Id.*

During the national sales meeting, Fleener made comments that caused some of his subordinates to feel uncomfortable. At a break-out session, Fleener told one of his female subordinates that he liked her earrings and thought that it was "sexy" when a woman has her

---

[2]In a somewhat unorthodox procedure, Wrigley attached the documents that it produced during discovery as a single mass exhibit to the affidavit of Thomas Dutton, who attested in his affidavit that the documents were all kept by Wrigley in the regular course of business. Fleener has not objected to this manner of presentation, however, nor has Fleener raised any objection to the documents' admissibility or use by the Court.

nails done.  Dutton Aff. Ex. 6 at DEF000607.  He also said, "Guys, let's take a poll, who likes it when a woman gets her nails done?"  *Id.*  Later, the same subordinate handed Fleener a napkin to wipe some chocolate off of his face and asked him if he needed help.  *Id.*  Fleener turned around, pointed to his backside, and said, "wipe this."  *Id.*

The female subordinate complained about these comments to Thomas Dutton, a manager in Wrigley's "People and Organization" department (which handles human resources).  *Id.*; George Dep. 16-17; Schalberg Dep. 27-28; Dutton Dep. 21.  In consultation with his boss, Michael Hand, Dutton decided to gather feedback from Fleener's subordinates in a process known as a "360 survey."  Dutton Dep. 21; Schalberg Dep. 28; Hand Dep. 23 (describing 360 surveys).  As part of the 360 survey, Dutton interviewed all of Fleener's subordinates and also obtained comments through a written questionnaire.  Dutton Dep. 33-34; Dutton Aff. Ex. 6 at DEF000585; *id.* at DEF000555-60.  Fleener knew about the 360 survey and in fact insisted that he had a legal right to see both the questions posed to his subordinates and his subordinates' answers to those questions.  Dutton Aff. Ex. 6 at DEF000585.

On September 25, Dutton forwarded the subordinates' feedback to Hand, Schalberg, and Phil George (Schalberg's boss, George Dep. 9) for review.  Dutton Aff. Ex. 6 at DEF000555.  A few days later, Schalberg notified Fleener that he and Dutton wanted to meet with Fleener in Buffalo, Minnesota on October 8 to discuss the results of the 360 survey.[3]  *Id.* at DEF000550.  Fleener seemed concerned about the location, asking, "Why are we meeting in Buffalo?"  *Id.* at DEF000549.  When Schalberg responded that they could meet in Minneapolis instead, Fleener

---

[3]During his deposition, Fleener initially was not sure whether this meeting took place on October 8 or October 9.  Fleener Dep. 40.  After reviewing one of his emails, he testified that he believed the meeting was on October 8.  Fleener Dep. 52.

responded, "Does this mean I'm getting fired?" *Id.* As Fleener testified, "usually when somebody was met with close to their home they were terminated." Fleener Dep. 54.

After Schalberg and Dutton met with Fleener on October 8, they had a telephone conference with Hand and George. Dutton Dep. 47. The four managers collectively decided to terminate Fleener's employment for "conduct unbecoming a manager." Hand Dep. 13, 22; Schalberg Dep. 19-20; Dutton Dep. 13, 32, 36, 41, 47-48; George Dep. 15-16, 36.

When asked to elaborate at their depositions, the managers had difficulty recalling specifics but testified to concerns about Fleener's sometimes unprofessional or threatening management style, including the "wipe this" comment at the national sales meeting, Dutton Dep. 12-13, George Dep. 44, Schalberg Dep. 19-20, 26; the message threatening PIPs, George Dep. 43-44, Schalberg Dep. 19, 26; Fleener's leering at a female subordinate and commenting about her earrings and nails in a way that made her uncomfortable, Dutton Dep. 32-37, 51; the "all eyes and ears are watching" email about the national sales meeting, Dutton Dep. 17, George Dep. 44; Fleener's telling his subordinates not to trust George, Dutton Dep. 17, Dutton Aff. Ex. 6 at DEF000555; and the general "climate of fear" that Fleener created among his subordinates, Dutton Dep. 15, 17-18, 54; George Dep. 20 (referring to Fleener's "ongoing pattern of threatening behavior towards his associates, written and verbal" and his "ongoing pattern of driving paranoia, an ongoing pattern of operating outside the boundaries of trusting and respect"); George Dep. 44 (Fleener's warnings about upper management "drive[] paranoia"). Hand also mentioned Fleener's attempt to breach the anonymity of the 360 survey as a significant issue. Hand Dep. 22-23. In addition, George mentioned an incident in which Fleener

allegedly gave incorrect retirement information to an employee, George Dep. 21, but Dutton testified that that incident did not factor into Fleener's termination, Dutton Dep. 53.

Dutton and Schalberg planned to meet with Fleener on October 9 — that is, the day after the October 8 meeting — to terminate him.  George Dep. 56; Fleener Dep. 52 (meetings took place on October 8 and 9).  But after the October 8 meeting and before the scheduled October 9 meeting, Fleener sent an email to several managers — including George and Hand — alleging that Schalberg had made inappropriate comments about female employees to Fleener over the phone.[4]  Fleener Dep. 56-57.  This was the first time that Fleener had told anyone about Schalberg's alleged comments.  Fleener Dep. 32, 57, 131.  Schalberg, Dutton, Hand, and George — that is, all four of the managers involved in the decision to terminate Fleener — testified that they had already made the decision to terminate Fleener before Fleener sent the email.  Hand Dep. 19; Dutton Dep. 47-48; George Dep. 56; Schalberg Dep. 25.

After Fleener sent the email, Hand ordered that Fleener's termination be postponed and that Fleener be suspended with pay pending an investigation of his allegations against Schalberg.  Dutton Aff. Ex. 6 at DEF000546; Hand Dep. 11-12; George Dep. 56; Fleener Dep. 35-36.  Hand also ordered that Schalberg not be given any details about the investigation, but simply be told that Fleener had raised concerns that needed to be addressed before Fleener was terminated.  Dutton Aff. Ex. 6 at DEF000546.  Schalberg was thereafter removed from the termination

---

[4]The email also detailed a list of Fleener's other grievances against Schalberg, such as that Schalberg made fun of Fleener's weight, shared Fleener's career goals with other people, tried to manipulate performance-evaluation scores, and made a "big show" of mentioning a donation he had made on behalf of an ill coworker during a meeting.  Fleener Dep. 59-62.

process and Fleener met with Dutton alone on October 9.[5]  George Dep. 56-57; Fleener Dep. 35. The two men reviewed Fleener's allegations against Schalberg, after which Dutton suspended Fleener with pay.  Fleener Dep. 35-36.  Dutton testified that Fleener was suspended in lieu of termination so that Fleener would be readily available during Dutton's investigation of Schalberg.  Dutton Dep. 13-14, 25, 48.

The next day, Fleener forwarded Dutton and Hand numerous past emails from Schalberg intended to demonstrate that Fleener was doing his job properly and to showcase Schalberg's "communication style and how he offends people."  Gallagher Ex. 7 at 000003; Fleener Dep. 81. With the exception of Schalberg's "Davie's Angels" email, none of the emails includes any sex-based comments about female employees.  Fleener Dep. Exs. 4, 13, 14, 15, 18, 19, 20, 21, 23, 25, 26, 27, 28, 29, 31; Fleener Dep. 70-113.

After speaking with Schalberg and Schalberg's current and former subordinates, Dutton determined that he could not verify Fleener's allegations about Schalberg's behavior.  Dutton Dep. 14, 22; Hand Dep. 11-12, 14.  Dutton discussed his findings with Hand and George. Hand Dep. 14.

On October 12, Dutton contacted Fleener and asked him to meet at a motel in Monticello the following Monday (October 15).  Fleener Dep. 37.  That same day, Fleener asked for his personnel file.  Fleener Dep. 41; Dutton Aff. Ex. 6 at DEF000534.  Hand forwarded Fleener's request to an employee named Rosanna Smith and asked her to pull the file so that it could be reviewed by the legal department before it was sent to Fleener.  Dutton Aff. Ex. 6

---

[5]Fleener's testimony concerns a meeting that ostensibly took place on October 10. As noted, Fleener initially seemed to believe that the meetings took place on October 9 and 10, but later testified that they took place on October 8 and 9. Fleener Dep. 52.

at DEF000534.  Fleener did not receive the file until December 4 and alleges that the file he received was incomplete.  Fleener Dep. 41, 128.

On October 15, Fleener met with Dutton and Hand, who told him that he was being terminated.  Fleener Dep. 37-39.  When Fleener asked why, Hand told him that it was for "conduct unbecoming of a manager" and refused to give further details.  Fleener Dep. 39.

## II. ANALYSIS

### A. *Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. *Fleener's Claims*

Fleener alleges that he was fired in retaliation for reporting Schalberg's conduct and for requesting his personnel file.  To establish a prima facie case of retaliation under Title VII and the MHRA, Fleener must show (1) that he engaged in statutorily protected conduct; (2) that he suffered an adverse employment action; and (3) a causal connection between the two events. *Barker v. Mo. Dep't of Corr.*, 513 F.3d 831, 835 (8th Cir. 2008); *Bahr v. Capella Univ.*, 788 N.W.2d 76, 81 (Minn. 2010).  There do not appear to be any reported decisions substantively analyzing a retaliation claim under Minn. Stat. § 181.964, but the parties seem to agree that the

analysis under § 181.964 does not differ in any material respect from the analysis under Title VII and the MHRA.

For purposes of Wrigley's motion, the only element at issue is whether Fleener has shown a causal connection between his protected conduct and his discharge. As explained below, the Court finds that Fleener has failed to submit evidence sufficient to create a genuine dispute of fact regarding that element.

1. Title VII and MHRA Claims

Fleener argues that he has shown a causal connection between his reports of Schalberg's conduct and his discharge because he was a stellar employee, the reasons given for his discharge are flimsy, and there is a close temporal connection between his reports and his discharge.

Fleener's claim of a temporal connection is without merit. As noted, all four managers testified that they decided to terminate Fleener during a telephone conference that was conducted *before* they learned of the October 9 email in which Fleener complained about Schalberg's conduct. Fleener contends that all four of these managers may be lying, but "[t]he mere possibility that a witness's trial testimony will not be believed is never a sufficient reason to deny a summary judgment motion premised on that testimony." *BFI Waste Sys. of N. Am. LLC v. Freeway Transfer, Inc.*, 867 F. Supp. 2d 1037, 1047 (D. Minn. 2012). If a nonmovant could defeat summary judgment simply by saying that the movant's witnesses might not be believed by the jury, summary judgment would rarely be granted. To defeat summary judgment, a nonmovant must point to specific evidence in the record that could reasonably cause a jury to disbelieve the movant's witnesses.

The record contains no such evidence. To the contrary, the record shows that, on learning about Fleener's allegations, Hand told George and Dutton that "[w]e need to stop the termination," which corroborates the managers' testimony that they had already decided to terminate Fleener. Dutton Aff. Ex. 6 at DEF000546. In addition, as Fleener himself testified, a meeting near an employee's home is usually a signal to a Wrigley employee that the employee is about to be terminated. Fleener Dep. 54. Indeed, when Schalberg contacted Fleener to schedule the October 8 meeting near Fleener's home, Fleener asked, "Does this mean I'm getting fired?" Dutton Aff. Ex. 6 at DEF000549. In other words, Fleener himself saw the writing on the wall before he sent the October 9 email complaining about Schalberg. Finally, there is no dispute that Dutton began investigating Fleener's conduct at the national sales meeting long before Fleener sent the October 9 email.

In short, none of the evidence in the record contradicts — and some of the evidence in the record corroborates — the testimony of the four managers that they decided to fire Fleener during a conference call conducted before any of them had learned of the October 9 email. Under the circumstances, the fact that the decision to terminate Fleener was not actually *executed* until after he reported Schalberg's conduct on October 9 would not allow a reasonable jury to find that Fleener was fired in retaliation for that report. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

Fleener points out that the October 9 email was not his only complaint and that he repeatedly complained about Schalberg's conduct directly to Schalberg. This circumstance would not permit a reasonable jury to find in Fleener's favor, however. First, there is no temporal connection between Fleener's complaints to Schalberg (which began in March) and Fleener's termination (which took place in October). *Sisk v. Picture People, Inc.*, 669 F.3d 896, 901 (8th Cir. 2012) ("More than two months is too long to support a finding of causation without something more."). Second, Fleener cites no evidence that Schalberg had anything to do with instigating the process that led to Fleener's termination. Instead, the evidence is clear that it was a complaint made by one of Fleener's female subordinates to Dutton that prompted the 360 survey and that ultimately led to Fleener's termination. *See Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1001 (8th Cir. 2011) ("A plaintiff's prima facie retaliation case, built on temporal proximity, is undermined where the allegedly retaliatory motive coincides temporally with the non-retaliatory motive.").

It is true that Schalberg was one of four managers who participated in the decision to terminate Fleener, but there is no evidence that Schalberg was the driving force behind the termination or that, as Fleener claims, Schalberg and Dutton "concocted" a plan to get Fleener fired via the 360 survey. To the contrary, Schalberg testified (without contradiction in the record) that he was merely "aligned" with the decision and that he had difficulty opining that Fleener should have been fired. Schalberg Dep. 20. And once Fleener's complaints about Schalberg came to light, Schalberg was removed from any further involvement in the termination process. Under these circumstances, no reasonable jury could find a causal connection between Fleener's complaints and his termination. *Wells v. SCI Mgmt., L.P.*, 469

F.3d 697, 702 (8th Cir. 2006) ("the lack of a causal connection is reinforced by the undisputed evidence of the various customer and co-worker complaints lodged against Wells").

Fleener also argues that a jury could find a causal connection because Wrigley's reasons for terminating him were weak and vague. To begin with, Fleener's argument ignores the fact that Wrigley is not obligated to assert *any* reason for his discharge until Fleener first offers evidence of a causal connection. *See Sisk*, 669 F.3d at 899 ("Until a defendant articulates a non-discriminatory reason for the alleged adverse employment action, the relevant inquiry is the sufficiency of the plaintiff's prima facie case.").

Setting that aside, Fleener's argument is not supported by the record. Wrigley's stated reason for terminating Fleener was that he engaged in conduct unbecoming a manager. At their depositions, the four managers had trouble remembering all of the details of Fleener's conduct. But that, in itself, is not sufficient to cast doubt on Wrigley's stated reason for firing Fleener. This is not a case in which the employer's stated reason has shifted over time; to the contrary, from the day that it fired Fleener to the day that it argued its motion for summary judgment, Wrigley has consistently said that Fleener was terminated for conduct unbecoming a manager.

Fleener faults Wrigley for failing to give a "specific legitimate reason" for his termination. It is clear from the managers' testimony, however, that their decision was not based on any one event but rather on an accumulation of factors, including negative feedback from Fleener's subordinates and numerous incidents that together suggested that Fleener was not a suitable manager. The fact that different managers emphasized different incidents — or even that some considered a particular incident to be relevant but others did not — is unremarkable. It certainly does not represent the sort of shifting explanations that give rise to an inference of

pretext. *Cf. Malloy v. U.S. Postal Serv.*, No. 13-1764, 2014 WL 2922307, at *4 (8th Cir. June 30, 2014) ("That Burke supplemented the consistent explanation with comments about her performance — perhaps to explain why leniency was unwarranted in this instance — does not undermine the employer's legitimate reason for the action."); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012) ("Substantial change in an employer's explanation over time can be evidence of pretext, but an elaboration generally is not."); *Wierman*, 638 F.3d at 1001 ("Casey's has only pointed out an additional aspect of the same behavior; this is not pretext.").

Fleener does not deny that he made the comments and sent the emails that Wrigley found to be problematic. Instead, Fleener takes issue with the reasonableness of Wrigley's decision to terminate him. It is not enough, however, for Fleener to cast doubt on the wisdom or fairness of Wrigley's decision. *See Lenzen v. Workers Comp. Reins. Ass'n*, 705 F.3d 816, 821-22 (8th Cir. 2013). It is true that Fleener won various performance awards over the years, but Wrigley has never contended that Fleener was terminated for poor performance. Rather, Wrigley decided to fire Fleener *despite* his strong performance because of his shortcomings as a manager. Wrigley's decision may not have been wise or fair, but it was lawful, and that is the only concern of this Court.

Fleener also points out that there is conflicting testimony about whether the timing of Fleener's complaint about Schalberg — that is, Fleener's decision to say nothing about Schalberg's alleged misconduct until the day after the October 8 meeting — affected Wrigley's evaluation of Fleener's credibility. But this alleged factual dispute has nothing to do with Wrigley's decision to terminate *Fleener*. The question is not whether the accusations that

Fleener made against Schalberg were viewed by Wrigley as credible; the question is whether Wrigley's decision to terminate Fleener was in retaliation for making those accusations. Obviously, it was not, given that the decision was made on October 8 and the accusations were made on October 9.

Finally, Fleener seems to suggest that there was something improper about his suspension, particularly in light of the fact that Schalberg was not suspended. But Fleener was not suspended during Wrigley's investigation of the allegations against him. Instead, Fleener was suspended after Wrigley completed that investigation and made the decision to fire him. Wrigley's suspension of Fleener was essentially a postponement of his firing; Wrigley postponed his firing because it wanted Fleener to cooperate with its investigation of Schalberg. Once that investigation concluded, Wrigley implemented the decision to fire Fleener. By contrast, at the time it suspended Fleener, Wrigley had just begun its investigation of Schalberg; it had not made the decision to fire him, and it did not need him to cooperate in the investigation of another employee. Hence, there is nothing inconsistent in Wrigley's treatment of the two men. Both men were allowed to continue working while allegations of misconduct against them were being investigated.

In short, Fleener has failed to show any causal connection between his reports of Schalberg's conduct and his termination. Wrigley's motion is therefore granted as to Fleener's Title VII and MHRA claims.

2. Minn. Stat. § 181.964

Fleener's claim that he was fired in retaliation for requesting a copy of his personnel file fails for the same reason that his Title VII and MHRA claims fail.[6] The evidence is clear that Wrigley decided to fire Fleener *before* Fleener asked for his personnel file, and thus his termination could not have been in retaliation for that request. For that reason, Wrigley's motion for summary judgment is granted as to this claim.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment [ECF No. 39] is GRANTED.

2. Plaintiff's amended complaint [ECF No. 14] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 2, 2014
s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge

---

[6]Fleener's amended complaint could be read to claim that Wrigley should be held liable not only for retaliating against him for requesting his personnel file, but also for failing to timely provide a copy of that file. At oral argument, however, Fleener clarified that he is only bringing a retaliation claim.